IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA


KATHY LYNN HILL as          ]
ADMINISTRATOR OF THE ESTATE  ]
OF ROCKY JOE DOCKERY,      ]
                            ]
     Plaintiffs,            ]
                            ]
vs.                        ]    Case No.: 1:05-cv-279
                            ]
BRADLEY COUNTY BOARD OF    ]
EDUCATION; and    BRADLEY    ]
CENTRAL HIGH SCHOOL and     ]
ROBERT L. TAYLOR, as       ]    MAGISTRATE CARTER
Superintendent and/or Director of    ]
Bradley County Schools, ROBERT    ]    JURY DEMAND
MALONE and WILLARDEAN      ]
MALONE, individually d/b/a as Malone ]
Busing, Inc.; and ADA HASTINGS,   ]
as Bus Driver for Bus #23,       ]
                            ]
     Defendants.          ]


MEMORANDUM

I. Introduction

    Defendants Bradley County Board of Education (BCBE); Bradley Central High School

(BCHS); Robert L. Taylor, Superintendent and/or Director of Bradley County Schools; Robert

and Willardean Malone, individually d/b/a Malone Busing, Inc. (the Malones); and Ada

Hastings, as bus driver for Bus 23, have moved for summary judgment in the instant action.

[Doc. 73].  This case arises from a tragic incident in which Rocky Joe Dockery (Rocky or

decedent), a minor, died after leaping from the window of a moving school bus. Plaintiff asserts

state law negligence claims and various claims under 42 U.S.C. § 1983 and § 504 of the

Rehabilitation Act of 1973 (§ 504), 29 U.S.C. § 794, alleging the defendants failed to provide

Rocky with appropriate educational accommodations resulting ultimately in his death.  For the

reasons stated herein, the defendants' motion for summary judgment is well taken, and an order

shall enter granting it.

## II. Relevant Facts

*October 1, 2004*

At approximately 3:40 PM EDT on Friday, October 1, 2004, Rocky Dockery, a fifteen

year-old freshman at BCHS, boarded a bus at school to go home.  The bus was driven by

defendant Ada Hastings.  (Deposition of Gary Austin, 40:11, Exhibit 11, p. 79.)  The bus

departed BCHS at approximately 3:45 PM EDT.  (*Id.*)  At approximately 4:00 PM EDT, Rocky

informed the student sitting next to him, Phillip Henry, that Rocky wanted to get off at a non-

designated stop closer to his home so that he could get home in time to either play video games

or go to a BCHS football game.  (*Id.* at 40:11, Exhibit 11, p. 83.)

According to Ms. Hastings and the Board of Education's own internal investigation, as

the bus approached Goodwill Road, Rocky left his seat, and approached Ms. Hastings.  He

appeared agitated, and he asked to be let off at Goodwill Road, which was not a designated stop.

(*Id.* at 40:11, 42:16-21, Exhibit 11, p. 83; Deposition of Ada Hastings, 31:2-32:16, 56:25-57:2.)

Ms. Hastings denied Rocky's request and explained that she could not let him off at a non-

designated stop without authorization from a supervisor at the BCBE Central Office.

(Deposition of Ada Hastings, 31-32, 56-57.)  This exchange occurred as bus #23, moving at 40-

45 miles per hour, approached and traversed the intersection of Spring Place Road and Goodwill

Road in the middle of a curve. (*Id*. at 17:16-22, 32:9-34:21, 36:19-37:5, 41:1-5, 48:7-49:7; Deposition of Gary Austin, 40:11, 42:22-24, 46:2-9, Ex. 11, p. 79.) As Ms. Hastings passed Goodwill Road, immediately after Ms. Hastings told Rocky she could not drop him off, Rocky announced, "Fuck it…I'll jump!" and simultaneously turned toward the third seat on the passenger side of the bus, removing an outer garment and throwing it as he moved straight to the window. Ms. Hastings was watching Rocky in her rear view mirror. (*Id*.; Deposition of Ada Hastings, 17:16-22, 32:9-34:21, 36:19-37:5, 42:1-5, 48:7-49:7, 57). Rocky climbed up the third or fourth seat, and with his chest facing the ground, swung his right foot out of the window on the passenger side. (*Id*. at 34:22-36:18). Ms. Hastings started braking when Rocky stepped up on the seat and hit the brakes "really hard" when Rocky placed his right foot out the window. (*Id.* at 41:6-19, 43, 57:7-16.) At this point, at least one other student on the bus tried to grab Rocky but was unsuccessful. (*Id*. at 45:8-16, 57:23-58:1) When the second foot went out the window, Ms. Hastings was hitting the breaks "really hard." (*Id*. at 43). Rocky held on to the slowing bus by gripping the lower part of the window with both hands and with his legs pulled up to his chest while facing the rear of bus #23. (*Id*. at 43, 50:16-52:12.) Ms. Hastings could see Rocky now in her side view mirror. (*Id.* at 50). Unable to maintain his grip for more than a second or two, Rocky fell from the bus. (*Id*.) Rocky landed on the back of his head and his shoulders, rolled several times, and came to rest in the drainage ditch. (*Id*. at 49:25-50:8, 52:20-53:8, 58:2-7.) Everything happened "very fast." (*Id.* at 53). Ms. Hastings brought the bus to a complete stop, immediately exited the bus, and went to Rocky's aid. (Deposition of Ada Hastings, 43:24-44:10.) The driver of bus #60, which was directly behind Ms. Hastings' bus, called 9-1-1 as he ran to Rocky's position. (Deposition of Gary Austin, 40:11, Ex. 11, pp. 79,

85.)  Two nurses who were nearby provided emergency treatment to Rocky until EMS personnel

arrived on the scene at approximately twelve minutes later.  (*Id*. at 40:11, Ex. 11, p. 79.)

Approximately thirty minutes later, a LifeForce helicopter arrived and airlifted Rocky to the

Trauma Unit at Erlanger Medical Center in Chattanooga.  (*Id*. at 40:11, Ex. 11, p. 85.)  Rocky

suffered severe injuries and was removed from life support on October 2, 2004.  (*Id*. at 40:11,

Ex. 11, p. 79.)

Plaintiff has submitted evidence which augments, and in some matters varies, in certain

respects from Ms. Hastings' version of events and the Board of Education's internal investigation

concerning the incident of October 1, 2004.  BCHS student Cody Easley rode the bus with Rocky

on October 1, 2004.  Country music was being played loudly in the bus as was customary. Cody

did not know Rocky had left the bus until after the bus stopped.  (Affidavit of Cody Eugene

Easley at ¶¶ 4-7).  BCHS student Andrew Murphy also rode the bus with Rocky on October 1,

2004.  (Affidavit of Andrew Murphy at ¶ 7).  Andrew saw Rocky walk up to the bus driver and

say something quietly, then turn around and come back to his seat.  Andrew and another friend

were trying to figure out what made Rocky upset.  Two other students began taunting Rocky and

saying, "Jump, you won't jump."  Rocky became extremely upset and went to the bus driver

again.  Andrew then heard Rocky scream, "Fuck it then, I'll just jump."  Rocky turned around

and ran down the aisle of the bus and proceeded to climb out the window.  (*Id.* at ¶ 7-11).

Ryan Crumbly was in the bus directly behind the one transporting Rocky on October 1, 2004.

(Affidavit of Ryan Christopher Crumbly at ¶ 4).  He saw what appeared to be someone climbing

out of the window of the bus in front of his bus.  He then realized that half of the person's body

was hanging outside the window and then fell to the ground and rolled. (*Id.* at ¶ 4-5).  Crumbly

stated, "I remember the brake lights on the bus in front of mine being on at the same time as [Rocky] was halfway out of the window." (*Id.* at ¶ 6).

Plaintiff has submitted the affidavit of a school transportation expert, Carlisle Beasley. Mr. Beasley stated:

> In reviewing the forensics testimony, the pathology report, and statements at the scene, it appears that the physical injuries to Mr. Dockery were to his head and shoulder areas, which would tend to show the brakes were not applied by Ms. Hastings until after Mr. Dockery had exited the bus and was hanging from the outside.

(Affidavit of Carl Beasley at ¶ 6). According to Mr. Beasley, Ms. Hastings acted with reckless disregard for Rocky's safety by failing to brake immediately after Rocky announced he was going to jump. (*Id.* at ¶ ¶ 4, 7). Ms. Hastings also failed to follow "specific bus transportation practices" by playing the music so loud that Ms. Hastings "was unable to take corrective action in a timely fashion due to the noise level being so high as to interfere with any notice of Mr. Dockery's actions and/or other student [sic] attempting to notify the bus driver of such actions." (*Id.* at ¶ 9).

*Background Information*

The BCBE's school district is a rural school district in southeast Tennessee; approximately 10,000 students attend 16 elementary, middle, high, and adult learning schools, including Taylor Elementary School (Taylor), Lake Forest Middle School (LFMS), and BCHS. In each school year since 2003-2004, approximately ten percent (10 %) of BCBE students have received special education or related services. (Affidavit of Vicki Beaty at ¶ 4.)

In BCBE schools, BCBE employees engage in a pre-referral process to try preliminary accommodations before referring a child for a special education evaluation. (*Id.* at ¶ 5). BCBE's

pre-referral and referral processes documented for the 2005-2006 school year were in place for and applied to the 2004-2005 school year and were comparable in scope to those used in the 1995-1996 through 2003-2004 school years. (*Id*. at ¶¶ 7-8.) If a child is not eligible for special education or related services under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et. seq.*, BCBE employees who participate in the appraisal process will suggest that other school officials consider the child for non-IDEA accommodations such as those available under § 504. (*Id*. at ¶¶ 9-10; Deposition of Dinah Bivens, 40:24-41:13; Affidavit of Randall Ferguson, ¶ 9.) The interventions developed, implemented, and evaluated as part of the pre-referral process are highly similar and often identical to the accommodations developed and provided to § 504-Only children. (Affidavit of Randal Ferguson at ¶ 14; Affidavit of Vicky Beaty at ¶ 11.)

In 2004-2005, BCBE was commended by the State of Tennessee for having an outstanding "child-find" initiative. (Affidavit of Vicki Beaty at ¶ 13.) As in previous years, BCBE's "child-find" initiative included announcements broadcast on multiple television and radio stations; flyers posted in public areas like the post office, courthouse, and every BCBE school facility; flyers posted in private areas like Wal-Mart; community "fun days" specifically geared towards pre-school children; announcements published in local newspapers; and announcements published in school materials, such as school calendars or student handbooks. (*Id*. at ¶ 14.)

BCBE contracts with owners of school buses—like the Malones—to service BCBE, and the contractors and drivers must comply with Tennessee state statutory and regulatory requirements regarding the operation of school buses—such as safety inspections of vehicles and licensing requirements. (Deposition of Willardean Malone, 6:16-6:22, 12:20-13:24; 19:11-18; Deposition of Gary Austin, 8:19-19:25, 24:21-25:19.) If an Individual Education Plan (IEP) or §

6

504 Plan involves the provision of special education transportation services for the child, BCBE uses its own "short" buses to transport the child, and transportation personnel have a need to know the details of the child's situation and are either involved in developing the IEP or § 504 Plan or informed of the special transportation needs of the child.  (Austin dep. at 20:1-24:19; Affidavit of Vicki Beaty, ¶ 12; Affidavit of Randell Ferguson,¶ 13.)

*1995-1996 through 2002-2003 School Years*

Rocky started kindergarten at Taylor in 1995 and remained there through the fifth grade. During this time,  he lived with his maternal great grandparents/adoptive parents, George and Geraldine Dockery (hereinafter "Mr. Dockery" and "Mrs. Dockery").  (Deposition of Kathy Hill, 20:15-21:9.)  Rocky was promoted from third to fourth and fourth to fifth grades for non-academic reasons.  (Affidavit of Shalanda Mohan, ¶¶ 9-10.)  According to Rocky's band teacher in seventh grade, Rocky never presented classroom behavioral problems.  (Affidavit of Ricky Donegan, ¶¶ 7-8.)  At the end of seventh grade (2002-2003 school year), Rocky was identified as an "at risk student" by LFMS officials, but by the end of seventh grade, Mr. and Mrs. Dockery did not seek a special education referral or transportation accommodations for Rocky.  (Affidavit of Ritchie Stevenson, LFMS Principal, ¶ ¶ 5 & 6; Affidavit of Randall Ferguson, ¶12.) Throughout this time, Rocky had average T-CAP scores, meaning his scores fell somewhere between the 25th and 75th national percentile.   (Deposition of Daniel J. Reschly, Ph.D., 126:14-133-4.)

*2003-2004 School Year*

In June or July 2003, Rocky went to live with Steve and Stacey Dockery (and attend schools) in Polk County, Tennessee, after Mr. Dockery died and Mrs. Dockery was placed in a nursing home.  (Deposition of Kathy Hill, 15:1-20.)  On January 8, 2004, Rocky began seeing

Richard A. Causo, M.D. ("Dr. Causo"), a behavioral pediatrician in Chattanooga, Tennessee, who diagnosed Rocky with attention-deficit hyperactivity disorder-inattentive type along with anxiety/depression and prescribed Effexor. (Affidavit of Greg Kyser, M.D., Exhibit A, p. 9.) By January 28, 2004, Dr. Causo thought Rocky might have bipolar disorder and prescribed Zyprexa. (*Id*.)

At the end of January 2004, Rocky had a disagreement with Steve Dockery, and went to live with his maternal great-aunt, Ms. Hill, her husband, Donald Hill (hereinafter "Mr. Hill") and Rocky's biological sister, Maigen Grisby about a week later. (Deposition of Kathy Hill, 17:19-23, 21:6-22:23.) On February 9, 2004, Rocky transferred to LFMS, where he was advanced to the eighth grade for non-academic reasons. (*Id*.; Affidavit of Ritchie Stevenson, ¶ 7.) When Ms. Hill signed Rocky up for school at LFMS, she informed an LFMS Guidance Counselor, Kristy Alicie, that Rocky was on medication for bipolar disorder but did not ask LFMS officials to look into providing Rocky with special education services or transportation accommodations. Ms. Hill stated Rocky was responding well to medication and did not indicate he was emotionally unstable or that he had been subjected to harassment in the past by his peers. (Deposition of Kathy Hill, 25:12-26:13; Affidavit of Kristy Alicie, ¶¶ 6-7.) In March and April 2004, Rocky participated in a class at LFMS called Career Education taught by Jason Humbert. (Affidavit of Charles W. Rose, ¶¶ 4-7; Affidavit of Jason Humbert, ¶¶ 4-9.) The purpose of the class was to review students' goals for high school, and Mr. Humbert invited all parents "to participate in this process." Mr. and Ms. Hill did not contact Mr. Humbert. (*Id*.)

Rocky began clinical sessions with Trevor Milliron, Ph.D. ("Dr. Milliron") on April 5, 2004, by which time Dr. Causo had also prescribed Lexapro. (Deposition of Trevor Milliron,

Ph.D., 11:22-24; Affidavit of Greg Kyser, M.D., Exhibit A, p. 12.) By May 11, 2004, Dr. Causo had diagnosed Rocky with schizophrenia and prescribed Abilify, an anti-psychotic medicine. (*Id*.)

At the end of the 2003-2004 school year, LFMS officials promoted Rocky to ninth grade for non-academic reasons. When deciding to advance a student for non-academic reasons, Principal Stevenson considers the ages of the student and his peers since discrepancies between the two often lead to even less desirable results. (Affidavit of Ritchie Stevenson, ¶7). At this time, Ms. Hill asked for a special education referral when she met with the LFMS Principal, Ritchie Stevenson (hereinafter "Mr. Stevenson"), to discuss Rocky's transition to high school. (Affidavit of Ritchie Stevenson, ¶¶ 8-9; Deposition of Kathy Hill, 31:2-33:8.) Mr. Stevenson told Ms. Hill that there was not enough time left in the 2003-2004 school year (school ended May 21, 2004) to obtain relevant data and schedule or conduct a pre-referral meeting and told her to call BCHS before school started in August to get the ball rolling. (*Id*.) Dr. Milliron encountered the same response when he called and talked to Joy Yates at the BCBE Central Office on Tuesday, May 18, 2004, which was three days before the last day of school. (Deposition of Trevor Milliron, Ph.D., 18:23-19:18.) Ms. Yates told Dr. Milliron that just because Rocky had schizophrenia did not automatically mean he would receive special services -- Rocky must be evaluated first. Dr. Milliron responded that he understood that but the evaluation process needed to be started because it was "important for Rocky to start school with a plan in place." Ms. Yates responded it would be difficult to do so but recommended Dr. Milliron call the BCHS counselor, Dinah Bivens. (Deposition of Trevor Milliron, Ph.D., 19). When asked in his deposition if he had thought the promotion to ninth grade was inappropriate, Dr. Milliron responded, "No, I

didn't necessarily think it was inappropriate, but I was concerned because of difficulties that could happen with the transition." (Deposition of Trevor Milliron, Ph.D., 19).

*Summer 2004*

In Summer 2004, Rocky continued seeing Dr. Causo, who discontinued Zyprexa and increased his Abilify. (Deposition of Trevor Milliron, Ph.D., 33:14-21.) Rocky also continued seeing Dr. Milliron, who explained that Rocky was teased outside of school, was improving based in part on his medication, and might have problems with the transition to high school. (*Id*. at 21:16-39:6.) In July 2004, Dr. Milliron contacted a BCHS Guidance Counselor, Dinah Bivens (hereinafter "Ms. Bivens"), to advise school authorities of Rocky's recent psychiatric diagnoses and possible transition issues, but not any transportation-related needs or concerns. (Affidavit of Dinah Bivens, ¶ 7.)

On Friday, July 30, 2004, Ms. Hill and Rocky met with Ms. Bivens to introduce Rocky to the school, register him for classes for the 2004-2005 school year, and discuss Ms. Hill's concerns about Rocky's transition. (*Id*. at ¶ 9; Deposition of Kathy Hill, 34:4-37:17.) They discussed Rocky's peer relationships generally; neither Ms. Hill nor Rocky described severe or pervasive harassment; they discussed (outside of Rocky's presence) Rocky's diagnoses and Ms. Hill's concerns about Rocky's transition; nobody communicated to Ms. Bivens a request for special transportation services or accommodations. (*Id*.; Affidavit of Dinah Bivens, ¶ 7.) Ms. Hill gave Ms. Bivens a prescription pad note from Dr. Causo stating Rocky suffered from ADHD, bipolar disorder, anxiety, and depression. They also discussed sleepiness as a side effect of Rocky's medication. Ms. Hill completed the standard Student Data Form provided to all incoming BCHS students, and Ms. Hill completed two Medical Report for Health/Physical

Impairments forms.  (*Id*.; Deposition of Kathy Hill, 210:12-211:4.)  In response to this conversation, Ms. Bivens assigned Rocky to classes she thought were best suited to him, physically showed him around the school, encouraged him to stop by, and prepared to pay special attention to him.  (Affidavit of Dinah Bivens, ¶ 10; Deposition of Dinah Bivens, 12:24-13:5, 15:4-17:2.) In July 2004, Ms. Bivens placed copies of the Student Data Form and prescription pad note in the BCHS Special Education Department's mailbox.  (Affidavit of Dinah Bivens, ¶ 11.)  The BCHS Special Education Department was not regularly staffed at this time. (Affidavit of Dinah Bivens, ¶ 11.)

*2004-2005 School Year*

On Monday, August 9, 2004, Rocky began his freshman year at BCHS; on Friday, August 13, 2004, the BCHS School Psychologist, Shalanda Mohan, viewed the prescription pad note, and the BCHS Special Education Department scheduled a pre-referral meeting with Ms. Hill. (Affidavit of Karen Murphy, Special Education teacher, ¶ 7; Deposition of Shalanda Mohan, 76:2-11.)  Sometime in the first weeks of school, Rocky solicited Ms. Bivens' help, and she helped him resolve a locker issue, drop band class, and switch from Auto Tech class to a more accommodating class.  (Deposition of Dinah Bivens, 17:24-18:15.)  Also in the first few weeks of school, Rocky's Wellness teacher at BCHS, Chuck Clark, called Ms. Hill at home to inquire about Rocky's sleep and bedtime schedules.  (Affidavit of Chuck Clark, ¶ 5.)  About a week later but before Tuesday, August 24, 2004, Mr. Clark ran into Ms. Hill in the BCHS attendance office. (Deposition of Kathy Hill, 39.  Mr. Clark told her Rocky was disrupting class by sleeping in class.  She explained to him that Rocky was taking medication, and told Mr. Clark he should talk to Ms. Bivens.  Mr. Clark responded that she should talk to Rocky's doctor about lowering the

dosage of his medication.  *Id.*  at 39-40. Ms. Hill did call Dr. Causo and he had Rocky cut in half

the dosage of one of his two medications.  *Id.* at 41-42.  After his dosage was reduced, Rocky

started getting very depressed and irritable.  When  Ms. Hill informed the doctor, he put Rocky

on a different medication.  *Id.* at 42-43.  Rocky's auditory hallucinations began to abate with the

new medicine, but he was still "real nervous" and depressed.  *Id.* at 43-44.

*First Pre-Referral Meeting on Tuesday, August 24, 2004*

On Tuesday, August 24, 2004, Rocky, Mr. and Ms. Hill, Ms. Mohan, Ms. Bivens,

Wellness teacher Mr. Clark and science teacher Mr. Reuter met as a team to conduct a pre-

referral meeting, begin the special education appraisal process, brainstorm solutions, implement

preliminary accommodations, and gather data and information that would be relevant throughout

the appraisal process.  (Affidavit of Chuck Clark, ¶ 9; Deposition of Kathy Hill, 38:8-18;

Affidavit of Shalanda Mohan, ¶ 11; Deposition of Shalanda Mohan, 76:12-91:18; Affidavit of

Dinah Bivens, ¶ 12.)

The team discussed Rocky's guardianship; his psychiatric diagnoses; the loss of his

adoptive parents; his medications and their side-effects—including drowsiness; and concerns

about his academic progress.  (Affidavit of Dinah Bivens at ¶ 13; Deposition of Dinah Bivens,

18:24-19:8; Affidavit of Shalanda Mohan, ¶ 12; Deposition of Shalanda Mohan, 81:2-83:21,

119:3-119:13; Affidavit of Chuck Clark, ¶ 10; Deposition of Kathy Hill, 209:5-210:9.)  Mr.

Clark specifically explained that Ms. Hill had to make sure Rocky's physician knew how much

Rocky was sleeping in class.  (Affidavit of Dinah Bivens, ¶ 14; Affidavit of Shalanda Mohan, ¶

13; Affidavit of Chuck Clark, ¶ 11.)  The team brainstormed and agreed to implement a variety

of preliminary academic accommodations in an effort to meet Rocky's educational needs,

including but not limited to getting Rocky a tutor, providing him with extra time on tests and assignments; providing him with different versions of tests; and repeating instructions to him. (Affidavit of Chuck Clark at ¶¶ 12-13; Affidavit of Shalanda Mohan, ¶¶ 14-15; Affidavit of Dinah Bivens, ¶¶ 15-16; Deposition of Kathy Hill, 209:5-210:9.) The team agreed to gather written teacher observations; collect information about the effectiveness of the interventions that had been implemented; obtain medical records from Dr. Causo and Dr. Milliron; review additional data such as Rocky's grades; and meet again in September 2004 to determine if a referral was needed for a full and individual evaluation to determine special education eligibility, adverse educational impact, and need for specially designed instruction. (*Id*.; Affidavit of Chuck Clark, ¶ 15; Affidavit of Shalanda Mohan, ¶ 16; Affidavit of Dinah Bivens, ¶17; Deposition of Dinah Bivens, 18:24-19:8.) Ms. Hill completed three Medical Statement forms seeking specific recommendations from Dr. Causo and Dr. Milliron. (Affidavit of Shalanda Mohan, ¶¶ 17, 24.)

After the rest of the team left, Rocky, Ms. Hill, Mr. Hill, and Ms. Mohan discussed Rocky's family/social, medical/development, school, and behavior histories; Ms. Mohan memorialized the discussion by completing a Parent Information form and writing detailed notes on the form. (*Id*. at ¶¶ 18, 21; Deposition of Shalanda Mohan, 12:18-153:1; Deposition of Kathy Hill, 209:9-210:9.) Ms. Mohan specifically asked if Rocky was emotionally stable or a threat to his own or others' safety; Ms. Hill and Rocky responded that he was not; and the four of them scheduled the second pre-referral meeting for Wednesday, September 22, 2004. (Affidavit of Shalanda Mohan, ¶¶ 18, 21.)

*Wednesday, August 25, 2004 through Wednesday, September 21, 2004*

The July 2004 Medical Report for Health/Physical Impairments and forms were faxed to and returned by Dr. Causo and Dr. Milliron on Tuesday, August 24, 2004 and Wednesday, August 25, 2004, respectively; Ms. Bivens immediately sent these materials to the BCHS Special Education Department.  (Affidavit of Dinah Bivens, ¶¶ 20-21; Deposition of Dinah Bivens, 27:20-29:1; Deposition of Trevor Milliron, Ph.D., Ex. 3.)  Dr. Milliron sent a letter to BCHS dated Thursday, August 23, 2004, in which he described Rocky's diagnoses, medications and dosages, and the side-effects of his medication—including hyper-somnia with grogginess. (Deposition of Trevor Milliron, Ph.D.  at 48:25-53:13; Affidavit of Shalanda Mohan, ¶¶ 24, 34.) On Wednesday, August 25, 2004, Dr. Causo sent a letter, dated Monday, August 19, 2004, to BCHS in which he described Rocky's diagnoses, medications and dosages, the side-effects of his medication—including drowsiness or sleepiness, and requested that Rocky's teachers excuse his sleepiness.  (*Id*.)

On Thursday, August 26, 2004, Rocky was written up for his sixth tardy; as punishment, he served a one period In School Suspension ("ISS") on Friday, August 27, 2004.  (Deposition of Angela Neely, 16:20-17:2.)  On Wednesday, September 1, 2004, Rocky was written-up for Misbehavior in Class after he threw a book at another boy; as punishment, he served a one-day ISS on Thursday, September 2, 2004.  (*Id*. at 19, 44.)  On Friday, September 3, 2004, Rocky fought the other boy in a BCHS bathroom; as punishment, they both served three-day out-of-school suspensions from Monday, September 7, 2004 through and including Thursday, September 9, 2004.  (*Id*. at 19, 44.)  On Tuesday, September 7, 2004, Ms. Hill called Dr. Causo's office wanting to "get him back on medication."  (Affidavit of Greg Kyser, M.D., Exhibit A, p. 16.)  On Monday, September 13, 2004, a BCHS special education staff member Karen Murphy

observed Rocky in English class and took notes on her observations. (Affidavit of Karen Murphy, ¶ 9; Deposition of Shalanda Mohan, 134:23-135:24.)

On Tuesday, September 14, 2004 Rocky wrote a letter to a female classmate, Sheryl Chesley ("Sheryl"), wherein he lamented the status of his relationship with Sheryl and threatened suicide. (Affidavit of Dinah Bivens, ¶¶ 22-23; Deposition of Dinah Bivens, 29:17-30:9.) Sheryl gave the letter to Ms. Bivens that afternoon, and the next morning Ms. Bivens sought out and talked to Rocky about the letter; Rocky assured her that he was okay, that he was just trying to get the girl's attention, and that he had discussed the matter with Ms. Hill. (Deposition of Dinah Bivens at 30:9-32:7; Affidavit of Dinah Bivens, ¶¶ 22-23.) In a second letter dated Wednesday, September 15, 2004, Rocky thanked Sheryl for talking him out of suicide and praised her qualities as a girlfriend; Ms. Bivens received a copy of this letter at the end of the day on Wednesday, September 15, 2004. (Affidavit of Dinah Bivens; Deposition of Dinah Bivens, 31:2-31:16.) Ms. Bivens discussed the letters with Special Education teacher Karen Murphy and gave them to Ms. Murphy on or about Wednesday, September 22, 2004. (Deposition of Dinah Bivens at 34:4-34:25; Affidavit of Dinah Bivens, ¶ 22; Affidavit of Karen Murphy, ¶ 10.) Dr. Milliron testified that after he saw Rocky's letters he was concerned and thought it was "important that we keep a close eye on Rocky" but Rocky did not need to be hospitalized nor did he need to be taken out of ordinary classes. (Deposition of Trevor Milliron, Ph.D., 75:13-78:11.) Dr. Causo's notes also reflect that Ms. Hill had self increased Rocky's dosage of Lexapro, an anti-depressant, at this time. (Affidavit of Greg Kyser, M.D., Ex. A, p. 16.)

*Second Pre-Referral Meeting on Wednesday, September 22, 2004*

On Wednesday, September 22, 2004, Rocky, Ms. Hill, Mr. Hill, Ms. Bivens, Ms. Mohan, Ms. Murphy, and Mr. Reuter met as a team to conduct the second pre-referral meeting and determine whether they should refer Rocky for a special education evaluation. (Deposition of Kathy Hill, 215:15-217:25; Affidavit of Shalanda Mohan, ¶ 22; Deposition of Shalanda Mohan, 116:24-117:1; Affidavit of Karen Murphy, ¶ 11; Affidavit of Dinah Bivens, ¶ 22.) The team examined and discussed ongoing concerns about Rocky's academic performance, especially his sleepiness in class; written teacher observations of Rocky over the previous month; Rocky's education records, including his grades and standardized test scores; the results of Rocky's most-recent visual and auditory tests; Rocky's discipline record for August and September 2004; the success of accommodations and interventions that were put in place at the first pre-referral meeting; and the information provided by Drs. Causo and Milliron, including their confirmation of Rocky's psychiatric diagnoses and suggestions—every one of which dealt exclusively with accommodating Rocky's sleepiness by adjusting his academic demands. (Deposition of Kathy Hill, 194:3-196:5; Affidavit of Shalanda Mohan, ¶¶ 24, 26, 34; Deposition of Shalanda Mohan, 116:16-117:4, 118:8:118:17, 130:7-135:24, 139:8-140:12, 141:11-142:1, 163:12-164:25, 168:24-169:1; Affidavit of Karen Murphy, ¶¶ 13-14; Affidavit of Dinah Bivens, ¶¶ 25-26, 28.) In light of the September 2004 letters to Sheryl, Ms. Mohan specifically asked Mr. and Ms. Hill whether Rocky was emotionally stable and whether he presented a threat to himself or other students; Ms. Hill and Rocky answered that he was responding well to his medications, was emotionally stable, and was not a threat to himself or others. (Affidavit of Shalanda Mohan, ¶ 25; Deposition of Shalanda Mohan, 113:24-114:17; Affidavit of Karen Murphy, ¶ 15; Affidavit of Dinah Bivens, ¶¶ 27-28.)

The team discussed and agreed to implement appropriate accommodations to address Rocky's sleepiness: he would be allowed to get up to stand and stretch when he felt sleepy; the team decided on scheduling him to take more "hands on" classes; and the team agreed to allow Rocky to have a cold drink—including caffeinated drinks—when he felt sleepy. (Affidavit of Dinah Bivens at ¶ 29; Deposition of Dinah Bivens, 36:14-37:10; Deposition of Kathy Hill, 215:15-217:25; Affidavit of Shalanda Mohan, ¶ 27; Deposition of Shalanda Mohan, 117:15-118:17, 136:8-136:22; Affidavit of Karen Murphy, ¶ 16.) The team decided to refer Rocky for an evaluation of his suspected disabilities (Specific Learning Disability, Emotional Disturbance, and Other Health Impairment) and determination of his eligibility to receive special education services. (Affidavit of Karen Murphy at ¶ 17; Affidavit of Dinah Bivens, ¶ 30; Deposition of Dinah Bivens, 36:14-37:10; Affidavit of Shalanda Mohan, ¶ 28; Deposition of Shalanda Mohan, 125:9-127:2, 150:23-152:9, 153:11-153:22.) Ms. Hill signed a form granting permission for BCBE officials to conduct the assessment; the team completed a Student Referral for Special Education form documenting the substantive materials and procedures that had been used up to that point, as well as the expected members of the IEP and the assessment plan; Ms. Hill was given a Prior Written Notice form describing: the proposed scope of the evaluation (psycho educational testing and academic testing), the reasons for the proposed evaluation (lack of academic progress), the options considered prior to the proposal (continue with modifications), the reasons these options were rejected (information from physicians), the materials used as a basis for the proposal ("Physician information, grades, teacher information, Discipline records, cum. records, counselor information, parent information"), and other relevant factors ("parental referral and concerns"); and Ms. Mohan completed a Request for Diagnostic Services form

requesting that Rocky be tested for suspected disabilities using specific tests. (Deposition of Shalanda Mohan at 125:9-127:2, 138:14-139:7, 146:3-153:22.159:10-160:3, Affidavit of Shalanda Mohan, ¶¶29-32; Affidavit of Karen Murphy, ¶¶ 18-20; Affidavit of Dinah Bivens, ¶¶ 31-34.)

During the Wednesday, September 22, 2004 second pre-referral meeting, Ms. Bivens and Ms. Murphy agreed to give Ms. Hill, outside of Rocky's presence, copies of the two letters he wrote to Sheryl; Ms. Murphy did so and expressed her and Ms. Bivens' concerns; Ms. Hill assured Ms. Murphy that Rocky was okay and that she would discuss the matter with him. (Deposition of Kathy Hill, 52:6-10; Affidavit of Dinah Bivens, ¶ 36; Deposition of Dinah Bivens, 34:4-34:25; Affidavit of Karen Murphy, ¶ 22; Deposition of Shalanda Mohan, 110:10-22.)

In October 2004, Mr. and Ms. Malone employed Ada Hastings ("Ms. Hastings") as a trained, licensed bus driver. (Deposition of Ada Hastings, 7:17-8:14, 11:515-15, 19:1-24.) In October 2004, Mr. and Ms. Malone maintained a spare school bus to use when one of their other buses was out of service for maintenance or repairs. (Deposition of Willardean Malone, 20:4-21:6.) Like their regular buses, the spare bus was inspected annually by the state; unlike their regular buses, the spare bus was equipped with a video surveillance system. (Deposition of Robert Malone, 9:8-10:13, 11:11-12:5, 20:10-22:9; Deposition of Gary Austin, 41:23-42:9.) Rocky's afternoon bus route began at BCHS, where he boarded a bus that transported him to Valley View Elementary School (VVES). (Deposition of Ada Hastings, 12:11-13, 15:19-23, 22:4-20.) At VVES, Rocky transferred to another bus, which would transport him to his final stop. (*Id*.) Ordinarily, Ms. Hastings drove the bus that serviced the first leg of Rocky's afternoon

route.  (*Id.*)  Ms. Hastings had never dropped off Rocky at Goodwill Road.  (*Id*. at 58:7-9.) Rocky

had never presented any problems on her bus before  nor was Ms. Hastings aware of any

harassment of Rocky by other students on the bus.  (*Id.* at 16, 47). Further, Ms. Hastings did not

know Rocky had any type of mental or emotional disabilities.  *(Id.* at 17-18.) Ms. Hill did not tell

anyone that Rocky was harassed by his peers though Ms. Hill did instruct Rocky to tell someone.

Ms. Hill does not know if Rocky ever did so. (Deposition of Gary Austin, 18:17-24, 35:5-7;

Deposition of Kathy Hill, 126:17-128:20, 138:9-23.)  Between August 9, 2004 and October 1,

2004, Rocky rode Ms. Hastings' route without incident.  (Deposition of Ada Hastings at 16:3-

18:1, 20:15-21:6, 47:4-8.)  On Friday, October 1, 2004, the bus that was usually used to service

the first leg of Rocky's afternoon route was out of service; Ms. Hastings used the spare bus to

service this leg of route # 23.  (*Id.* at 22:21-23:7.)  After the accident, BCHS students told the

BCBE Director of Transportation, Gary Austin (hereinafter "Mr. Austin"), who never knew of

Rocky's existence before the accident, that Rocky was picked on, but would not give names of

the teasers and explained that Rocky would never tell school officials about the teasing.

(Deposition of Gary Austin, 35:5-8, 64:15-65:1, Ex. 11, pp. 80-82.) BCHS student Sheryl

Chesley stated in her affidavit that she was a close friend and classmate of Rocky at BCHS and

she saw on several occasions other students demeaning and bullying Rocky.  Rocky also told her

that he had gone to Ms. Bivens sometimes twice a day "about problems he was having in

school." On October 1, 2004, the day of the incident, she saw Rocky being harassed by two male

students and she told Rocky to ignore them and get on the bus. (Affidavit of Sheryl Chesley at ¶ ¶

3-6, 10).  BCHS student Lacrecia Janelle Key also stated she saw other students bullying Rocky

numerous times, that Rocky had told her he had informed Ms. Bivens about it, and that Rocky

was upset and disturbed that nothing was done and Ms. Bivens could not get the bullying to stop. (Affidavit of Lacrecia Janelle Key, ¶¶ 4-8.) BCHS student Andrew Joseph Murphy stated he saw on numerous occasions other students pulling pranks and calling Rocky names. (Affidavit of Andrew Joseph Murphy, ¶¶ 4-6.) Dr. Milliron, Rocky's psychologist, testified in his deposition that he "would not have predicted any special transportation needs for Rocky" based on the events which took place from the time Rocky entered BCHS through the end of September. (Deposition of Trevor Milliron, Ph.D., 78-79.) The plaintiff has also submitted testimony from an education expert, Linda Bluth, Ed.D. According to Dr. Bluth, expedited action should have been taken at the very latest by July 30, 2004 to put a § 504 plan in place. (Deposition of Linda Bluth, Ed.D., 81-83). Dr. Bluth further testified that "there was such an established pattern of a child unable to benefit in the regular curriculum. I think grade three was the turning point that they should have really begun to consider things." *Id.* at 120. She also opined the following: when Dr. Milliron called and spoke with Joy Yates in the Board of Education Central Office in May of 2004 to ask that a plan be in place for Rocky when he entered the ninth grade at BCHS, the Board of Education should have taken responsibility to contact the BCHS director of special education rather than leaving that responsibility to Dr. Milliron. *Id.* at 127. Further, BCHS should have considered Rocky's mental condition when it decided to suspend him for three days for fighting with another student. *Id.* at 142-43. A § 504 coordinator should have been present in the pre-referral meetings held at BCHS in August and September 2004. *Id.* at 100-101. Rocky "deserved a special accommodation based upon his

mental status." *Id.* at 74.[1]  The Board of Education should have warned Ms. Hastings about

Rocky and his suicide note.  *Id.* at 96.

<h3 style="text-align:center">III. Standard of Review</h3>

Under Fed. R. Civ. P. 56(c), the Court will render summary judgment if there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law.  The burden is on the moving party to show conclusively no genuine issue of material fact

exists, *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994); *Kentucky Div.,*

*Horsemen's Benev. & Prot. Assoc., Inc. v. Turfway Park Racing Assoc., Inc.*, 20 F.3d 1406, 1411

(6th Cir. 1994), and the Court must view the facts and all inferences drawn therefrom in the light

most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986); *In re: Julian Co.,* 44 F.3d 426, 429 (6th Cir. 1995); *City Management*

*Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244, 250 (6th Cir. 1994).

Once the moving party presents evidence sufficient to support a motion under Rule 56,

the nonmoving party is not entitled to a trial merely on the basis of allegations.  The nonmoving

party may not rest on its pleadings, but must come forward with some significant probative

evidence to support its claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Lansing*

*Dairy*, 39 F.3d at 1347; *Horsemen's Benev.*, 20 F.3d at 1411; *see also Guarino v. Brookfield*

*Township Trustees*, 980 F.2d 399, 404-06 (6th Cir. 1992) (holding courts do not have the

responsibility to search the record *sua sponte* for genuine issues of material fact).  If the

nonmoving party fails to make a sufficient showing on an essential element of its case with

---

[1]However, Dr. Bluth has never specified what sort of accommodations should have been made.
(Deposition of Linda Bluth, Ed. D., 41.)

respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510-11, 91 L. Ed. 2d 202 (1986); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435-36 (6th Cir. 1987). The standard for summary judgment mirrors the standard for directed verdict. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S. Ct. at 2512. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter summary judgment. *Id.*; *Lansing Dairy*, 39 F.3d at 1347; *Horsemen's Benev.*, 20 F.3d at 1411.

## IV. Analysis

### A. Plaintiff's Claims Brought under 42 U.S.C. § 1983

42 U.S.C. § 1983 (Section 1983 or § 1983) is a remedial statute which does not itself create independent substantive legal rights. Section 1983 simply provides a vehicle by which a person may recover damages for a violation of his rights secured to him by federal law. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995). To make out a claim under Section 1983, a plaintiff is required to show that he has been deprived of a right, privilege, or immunity secured to him by the United States Constitution or other federal law and that the defendants caused the deprivation

while they were acting under color of state law.  *Gregory v. Shelby County, Tenn.,* 220 F.3d 433, 441 (6th Cir. 2000); *Baker v. Hadley,* 167 F.3d 1014, 1017 (6th Cir.), *cert. denied,* 528 U.S. 813 (1999) *Valot v. Southeast Local School Dist. Bd. of Educ.*, 107 F.3d 1220, 1225 (6th Cir.), *cert. denied,* 522 U.S. 861 (1997).

The Board of Education cannot, however, be held liable pursuant to § 1983 based on the doctrine of *respondeat superior.  Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *McCloud v. Testa,* 97 F.3d 1536, 1558 (6th Cir.1996).  A governmental entity may not be sued under § 1983 for monetary damages solely on the basis that an injury has been inflicted by one of its employees or agents.  Rather, the plaintiff must show that the governmental entity itself is the wrongdoer.  *Collins v. City of Harker Heights*, 503 U.S. 115 (1992); *Culberson v. Doan*, 125 F. Supp.2d 252, 273 (S.D. Ohio 2001).  To make such a showing, the plaintiff seeking to impose liability on a municipality under § 1983 must identify a "policy" or a "custom" that caused the plaintiff's injury.  *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403-04 (1997); *Monell*, 436 U.S. at 694; *Gregory*, 220 F.3d at 441; *Stemler v. City of Florence,* 126 F.3d 856, 865 (6th Cir. 1997), *cert. denied,* 528 U.S. 1118 (1998).

A "policy" can comprise a generally applicable rule, a single decision, or a series of decisions provided such rule, decision, or series of decisions were made by the municipality's duly constituted legislative body or its authorized final decision maker; *i.e.*, that official whose acts may fairly be said to be those of the municipality. *Brown*, 520 U.S. at 403-04; *see also Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989) (To meet the "policy" requirement, the plaintiff must identify "those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have

caused the particular constitutional or statutory violation."); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body.")   For example, in *Owen v. City of Independence*, 445 U.S. 622 (1980), the alleged formal decision of the city council to censure and discharge an employee without a hearing could, if proven to be a constitutional violation, constituted a "policy" for municipal liability purposes under §1983. *Owen*, 445 U.S. at 627-29, 633 and n. 13.

Where the alleged policymaker is a government official, that official must possess "final authority to establish municipal policy with respect to the action ordered."  *Pembaur*, 475 U.S. at 483 ("We hold that municipal liability under § 1983 attaches where- and only where - a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."); *see also Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989) (A "policy" for purposes of municipal liability under § 1983 must be made by "those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation.")  The question of whether a municipal official is a final policymaker for a local governmental entity must be determined by reference to state, not federal, law. *McMillian v. Monroe County, Ala.,* 520 U.S. 781 (1997); *Pembaur*, 475 U.S. at 483 ("whether an official had final policymaking authority is a question of state law.") For example, in *Pembaur*, the Supreme Court concluded the county prosecutor, who ordered police to make a forcible entry into a clinic to serve capiases, was a final policymaker where the police had been instructed to follow the prosecutor's instructions and a state statute provided county officers may "require .. instructions

from the [County Prosecutor] in matters connected with their official duties." *Pembaur*, 475

U.S. at 484-85 (brackets original).

Absent a policy, a plaintiff may still assert municipal liability for a "custom" which

violates federal law. *Monell*, 436 U.S. at 689; *Brown*, 520 U.S. at 404. A "custom" is an act

"that has not been formally approved by an appropriate decisionmaker," but "the relevant

practice is so widespread as to have the force of law." *Brown*, 520 U.S. at 404. As the Sixth

Circuit elaborated in *Cash v. Hamilton County Dept. of Adult Probation*, 388 F.3d 539, 543 (6th

Cir. 2006), *cert. denied*, 546 U.S. 927 and 546 U.S. 998 (2005):

> [t]his court has explained that a "custom" for the purposes of § 1983 liability
> "must be so permanent and well settled as to constitute a custom or usage with the
> force of law. In turn, the notion of 'law' must include deeply embedded traditional
> ways of carrying out state policy. It must reflect a course of action deliberately
> chosen from among various alternatives. In short, a 'custom' is a 'legal
> institution' not memorialized by written law."

(quoting *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 507-08 (6th Cir. 1996)). A § 1983

plaintiff may establish the existence of a custom by showing that policymaking officials knew

about and acquiesced in the practice at issue. *Memphis, Tenn. Area Local, Am. Postal Workers

Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir.2004); *see also Gregory v. Shelby County,

Tennessee*, 220 F.3d 433, 442 (6th Cir. 2000) (Absent evidence that the county or an authorized

final decisionmaker had actual or constructive notice of the custom at issue, the basis for

municipal liability under § 1983 was lacking); *Chancellor v. City of Detroit*, 454 F. Supp. 2d

645, 650 (E.D. Mich. 2006) (plaintiff provided sufficient evidence of custom for purposes of §

1983 municipal liability to avoid summary judgment where plaintiff provided evidence that

defendant City of Detroit knew or should have known about the unlawful actions and police

methods of certain officers, and the City was deliberately indifferent to those actions.) Further

elaborating on the "custom" issue, the Sixth Circuit in *Thomas v. City of Chattanooga*, 398 F.3d

426, 429 (6th Cir. 2005), *cert. denied*, 546 U.S. 814 stated:

> In the present case, the Thomases alleged that the City of Chattanooga had an
> unwritten policy, practice, or custom of condoning the use of excessive force
> against potential suspects. In *Doe,* this Court articulated the requirements for a
> municipal liability claim made on the basis of an "inaction theory," where a policy
> of tolerating federal rights violations is unwritten but nevertheless entrenched. We
> stated that, under such a theory, the plaintiff must show:
>
> (1) the existence of a clear and persistent pattern of [illegal activity];
>
> (2) notice or constructive notice on the part of the [defendant];
>
> (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their
> deliberate indifference in their failure to act can be said to amount to an official
> policy of inaction; and
>
> (4) that the [defendant's] custom was the "moving force" or direct causal link in
> the constitutional deprivation.

(bracket original).

Constructive notice will exist where the violation of federal law is so persistent and

systemic as to be plainly obvious to the relevant policymakers. *See Brown,* 520 U.S. 397*,* 404

("an act performed pursuant to a 'custom' that has not been formally approved by an appropriate

decisionmaker may fairly subject a municipality to liability on the theory that the relevant

practice is so widespread as to have the force of law"); *City of Canton , Ohio v. Harris*, 489 U.S.

378, 390 n. 10 (1989) ("It could also be that the police, in exercising their discretion, so often

violate constitutional rights that the need for further training must have been plainly obvious to

the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need"); *Latuszkin v.*

*City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001) (complaint failed to properly allege municipal

liability where the complaint failed to "allege any facts tending to show that City policymakers were aware of the behavior of the officers, or that the activity was so persistent and widespread that City policymakers should have known about the behavior"); *City of Detroit*, 454 F. Supp. 2d at 650 (plaintiff provided sufficient evidence of custom to avoid summary judgment where evidence showed that "the City of Detroit was aware of an unusually large number of police misconduct cases, and had the ability to monitor officers' performance and behavior with a computerized tracking system.")

Plaintiff alleges that the Board of Education violated the IDEA and § 504 of the Rehabilitation Act by failing to provide him a free appropriate public education and failing to provide him due process in attempting to develop a plan for a free and appropriate public education.[2] Such failure, plaintiff alleges, is embodied in the following conduct: unilaterally deciding to skip Rocky over half of the seventh grade and half of the eighth grade and sending him on to high school before he was socially, academically, and emotionally ready; failing to obtain meaningful input from Rocky's guardians about an appropriate educational plan for Rocky; engaging in a pattern of delay in providing Rocky with an Individual Education Plan (IEP) as required by the IDEA; failing to identify Rocky in a timely manner as needing special education and related services as required by § 504 of the Rehabilitation Act and by the IDEA; failing to intervene and stop other students from harassing and bullying Rocky; punishing Rocky

---

[2]The Court agrees with the defendants' statement that "the Complaint does not specifically identify the theory of relief sought pursuant to § 1983...." (Defendants' Brief in Support of Summary Judgment at 21). However, the defendants chose not to assail the sufficiency of plaintiff's complaint to assert a § 1983 claim pursuant to Fed. R. Civ. P. 12(b)(6). Rather, the defendants consider a number of possible claims the plaintiff may be making under § 1983 and argue evidence is lacking to support such claims. The Court will address the motion as presented.

(the three day suspension) like a regular student in violation of the IDEA; forcing Rocky to lower his medication; and failing to provide an appropriate form of transportation. Plaintiff also appears to allege that Rocky suffered a substantive due process 14th Amendment violation by failing to adequately protect Rocky from himself which resulted in Rocky's loss of life.

When viewing all the evidence in the light most favorable to the plaintiff, and assuming that Rocky's rights under the IDEA, § 504 of the Rehabilitation Act, and the Due Process Clause of the 14th Amendment were violated, plaintiff has presented no evidence of a policy or custom to support a claim for municipal liability under § 1983.

There is no evidence that the conduct at issue[3] took place pursuant to an official written policy created by the Board of Education or a Board of Education official with final decision making authority. There is no evidence that the Board of Education or an official with final decision making authority made any of the individual decisions at issue in this case. There is no evidence of conduct of the kind complained about by the plaintiff which is so pervasive and systemic throughout the Bradley County School system as to amount to a rule of law which gave the Board of Education constructive notice of the violations of federal law.[4] There is no evidence that the Board of Education or an official with final decision making authority knew about and

---

[3]"Conduct" as used in this context encompasses the defendants' alleged failure to act as well as defendants' affirmative conduct.

[4]Plaintiff has filed Deborah Anne Campbell's affidavit in which Ms. Campbell states her son, a student at Lake Forest Middle School and then BCHS, was identified as an "at risk" student because of an auditory processing problem, but the Board of Education has never evaluated him or provided any accommodations whatsoever for his auditory learning disability. Even assuming that these assertions are true, plaintiff has produced evidence of only two students that were not properly evaluated under § 504 and the IDEA. Thus evidence is lacking of a pervasive and systemic failure to meet students needs as required to give constructive notice to the Board of Education of a violation of federal law.

acquiesced to the conduct at issue in this case. Because the plaintiff has presented no evidence

from which a jury could conclude the conduct at issue in this case was taken pursuant to a policy

or custom of the Board of Education, plaintiff's claim under § 1983 against the Board of

Education fails as a matter of law.

Plaintiff has also named BCHS as a defendant in this case. Without any citation to

authority, defendants assert "BCHS is plainly not an entity in its own right." (Defendants' brief

in support of Motion for Summary Judgment at 21, Doc. 74). "A body politic is a 'person'

within the meaning of § 1983. *Miller v. Calhoun County,* 408 F.3d 803, 813 (6th Cir. 2005)

(citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690(1978)). I take judicial notice that BCHS

is not a "body politic" and that its employees are answerable to the Superintendent and the Board

of Education. Thus, BCHS is not a person within the meaning of § 1983. Further, even

assuming that BCHS is a person within the meaning of § 1983, BCHS is entitled to summary

judgment on plaintiff's § 1983 claims for the same reason as the Board of Education – plaintiff

can show no BCHS policy or custom of the conduct alleged which would subject BCHS to

liability under § 1983.

In addition to suing the Board of Education under § 1983, plaintiff also asserts his § 1983

claims against "Robert L. Taylor, as Superintendent and/or Director of Bradley County Schools."

During Mr. Taylor's deposition, plaintiff's counsel stated on the record that Mr. Taylor was sued

in his official capacity only. (*See* Deposition of Robert L. Taylor at 83). A claim against a

government employee in his official capacity constitutes a claim against the governmental entity

itself and cannot be maintained independently from the claim against the governmental entity.

*Kentucky v. Graham*, 473 U.S. 159 (1985); *Culberson v. Doan*, 125 F. Supp.2d 252, 273 (S.D.

Ohio 2001). "Official capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Id.* at 273 (quoting *Monell,* 436 U.S. at 690-91). Thus, the § 1983 claim against Mr. Taylor in his official capacity is a claim against the Board of Education and must fail because the plaintiff has no evidence to establish municipal liability

Further, even assuming the plaintiff had sued Mr. Taylor in his individual capacity, Mr. Taylor cannot be held liable in his individual capacity because the plaintiff has come forward with no facts to show that Mr. Taylor's conduct satisfies the standard for supervisory liability under § 1983 which is as follows:

> We have explained that "§ 1983 liability must be based on more than respondeat superior, or the right to control employees." *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir.1999), *cert. denied,* 530 U.S. 1264, 120 S.Ct. 2724, 147 L.Ed.2d 988 (2000). "Thus, a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee,* 199 F.3d at 300 (internal quotation marks and citation omitted). "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." 199 F.3d at 300 (internal quotation marks and citation omitted).

*Ontha v. Rutherford County, Tennessee,* 222 Fed. Appx. 498, *504 (6th Cir. Mar. 13, 2007); *see also Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002) ("Supervisory liability under § 1983 cannot be based upon mere failure to act but must be based upon active unconstitutional behavior"); *Spencer v. Bouchard*, 449 F.3d 721, 730 (6th Cir. 2006) (same). Plaintiff has failed to come forward with any evidence that Mr. Taylor knew anything about Rocky or was personally involved in anyway concerning Rocky until after Rocky died.[5]

---

[5]Further, plaintiff 's complaint identifies Mr. Taylor as the school superintendent but does not specifically mention him thereafter. Even the plaintiff's brief in opposition to the defendants'

Finally, the plaintiff appears to argue that her complaint asserts claims brought under §

1983 against Board of Education employees Gary Austin, Vicki Beaty, Katherine Ingram, Tom

Losh, Angela Neely, Shalanda Mohan and Dinah Bivens and against bus driver Ada Malone and

bus owners Robert and Willardean Malone, all in their individual capacities. This issue was

raised for the first time in the plaintiff's response brief to the defendant's motion for summary

judgment. (*See* Brief in Opposition at 18-22, Doc. 98)*.*  The defendants responded to this

argument in their reply brief. (*See* defendants' Reply Brief at 17-18, Doc. 137).  This issue

concerns the sufficiency of the Complaint to state a § 1983 claim against BCHS employees and

the contract employees.  Thus, the Court will evaluate this issue under the standards required for

a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

A motion to dismiss for failure to state a claim for which relief can be granted pursuant to

Fed. R. Civ. P. 12 tests the factual sufficiency of the plaintiff's complaint; it does not test the

strength of plaintiff's proof necessary to prove plaintiff's claim.  *See Central States, Southeast*

*and South West Areas Pension Fund v. Mahoning Nat'l Bank*, 112 F.3d 252, 254 (6th Cir. 1997);

*Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). The Court must

construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's

factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of

facts in support of the claims that would entitle relief. *Greenbergv. Life Ins. Co. of Virginia,* 177

F.3d 507, 514-15 (6th Cir. 1999)*; Grindstaff  v. Green*, 133 F.3d 416, 420 (6th Cir. 1998); *Meador*

*v. Cabinet for Human Resources*, 902 F.2d 474, 475 (6th Cir.1990), *cert. denied,*  498 U.S. 867

---

motion for summary judgment does not state with any specificity what Mr. Taylor himself
allegedly did to violate the plaintiff's federal rights.

(1990). Further, when determining the capacity in which an individual person has been sued under § 1983, it is not dispositive that the complaint fails to specifically state a person has been sued in his or her "individual capacity." *Rodgers v. Banks*, 344 F.3d 587, 594 (6th Cir. 2003). Whether a defendant in a §1983 claim has been sued in his individual capacity is determined by "a 'course of proceedings' test to ascertain whether a § 1983 defendant was on notice that the plaintiff intended to hold him personally liable...." *Id.* As explained further in *Rodgers*,

> Pursuant to this inquiry, "we consider the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims for qualified immunity, to determine whether the defendant had actual knowledge of the potential for individual liability." *Id.* at 968 (citing *Moore,* 272 F.3d at 772 n. 1). Additionally, we "consider whether subsequent pleadings put the defendant on notice of the capacity in which he or she is being sued." *Id.* (citing *Moore,* 272 F.3d at 772 n. 1).

*Id.*

Board of Education employees Gary Austin, Vicki Beaty, Katherine Ingram, Tom Losh, Angela Neely, Shalanda Mohan and Dinah Bivens are not identified in the caption of the Complaint. They are first mentioned in the Complaint according to their positions in the Bradley County School system under the heading, "PARTIES AND RELEVANT INDIVIDUALS AND ENTITIES." (Complaint ¶ 2). They are further discussed to varying degrees in the "FACTUAL ALLEGATIONS" section of the Complaint. However, Count I, the only count alleging a claim under § 1983, is entitled "Title 42 U.S.C. § 1983 AGAINST B.C.B.E[6]. AND AGENT B.C.H.S." While Count I states, "[t]his is a civil rights action for money damages against B.C.B. E., agent, B.C.H.S., and employees pursuant to Title 42 U.S.C. § 1983..." Count I does not identify any of the school employees by name or expressly state the conduct for which each individual employee

---

[6]B.C.B.E. is the Bradley County Board of Education.

should be held liable under § 1983. The prayer for relief corresponding to Count I does not make a request for damages or other relief against any specified person or entity. Further, only the Board of Education, BCHS, Robert Taylor as Superintendent, Ada Hastings and the Malones filed an answer to the complaint. (*See* Answer, Doc. 3, filed November 3, 2005). The plaintiff has never sought a default against the remaining school system employees mentioned in the first part of the complaint. No motion for qualified immunity has ever been filed. Further, it appears from the court record that Robert Taylor, Ada Hastings and the Malones are the only individuals who were served with a summons and complaint in this case.

Based on the course of proceedings test, the Court concludes the plaintiff has not stated a claim under § 1983 against Gary Austin, Vicki Beaty, Katherine Ingram, Tom Losh, Angela Neely, Shalanda Mohan or Dinah Bivens in his or her individual capacity. To the extent that any of these persons were sued in any capacity whatsoever, they were sued in their official capacities. Therefore, any § 1983 claim against them is actually a claim against the Board of Education and fails for the reasons previously stated.

As for Ada Hastings and the Malones, the Court also finds the Complaint asserts no § 1983 claim against them either. In the introductory section, the Complaint specifically states that Ms. Hasting and the Malones "will be hereinafter, referred, [sic] to as "Contract Defendants." (Complaint ¶ 18). The body of Count I does not mention the "Contract Defendants" or Ms. Hastings or the Malones in any way. Count I and the Complaint as a whole utterly fail to notify Ms. Hastings or the Malones that a § 1983 claim is being asserted against them. Finding otherwise at this point would, as the defendants assert, put Ms. Hastings and the Malones at peril of individual liability under § 1983 with no notice whatsoever. Therefore, the Contract

Defendants are entitled to judgment as a matter of law on this issue. *See* Fed. R. Civ. P. 8(a) and 12(c).

### B. *Plaintiff's Claims Brought Under § 504 of the Rehabilitation Act*

Plaintiff asserts a claim under 20 U.S.C. § 794, § 504 of the Rehabilitation Act of 1973 (§ 504) seeking monetary damages for intentional discrimination against Rocky by the Board of Education and BCHS on the basis of Rocky's depression and paranoid schizophrenia. (Complaint ¶¶ 50-51). The Complaint is somewhat unclear as to specifics of the plaintiff's § 504 claim.[7] However, it appears that the plaintiff is alleging the defendants acted with intentional discrimination or at least bad faith or gross misjudgment on the basis of Rocky's mental and emotional disabilities in the following ways: 1) promoting Rocky to the ninth grade when he was not emotionally, socially, or academically ready; 2) failing to reasonably accommodate Rocky by failing to put into place an expedited § 504 evaluation process and plan; 3) forcing Rocky's guardian to reduce Rocky's medications because they were causing him to sleep in class; 4) suspending Rocky without taking his mental disabilities into consideration; 5) failing to act appropriately on Rocky's suicide notes; 6) failing to provide Rocky with special transportation; 7) failing to stop harassment Rocky was receiving from other students on the basis of his disability; and 8) failing to stop other students from taunting Rocky on the bus and failing to stop the bus immediately when Rocky announced his intention to jump out the window. Further, plaintiff contends that all these factors, either in combination or singularly, were the proximate

---

[7]The defendants did not file a motion to dismiss under Fed. R. Civ. P. 12(c); rather, the defendants chose to file a motion for summary judgment under Fed. R. Civ. P. 56(c). Thus the Court will not look to the Complaint to determine the adequacy of the § 504 claim; rather the Court will look to the parties' briefs to flesh out the § 504 claim.

cause of Rocky's jumping out the bus window resulting in his death.[8]  Plaintiff seeks monetary

damages including damages for mental and physical suffering endured by Rocky, loss of life,

medical and funeral expenses, and loss of earning capacity.

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), states in relevant part:

> No otherwise qualified individual with a disability in the United States, as defined
> in section 705(20) of this title, shall, solely by reason of her or his disability, be
> excluded from the participation in, be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving Federal financial
> assistance....

To bring a claim of handicap discrimination under § 504, the plaintiff must show: 1) the

plaintiff is a handicapped person under the Rehabilitation Act, 2) the plaintiff is otherwise

qualified for participation in the program at issue, 3) the plaintiff is being excluded from

participation in, being denied the benefits of, or being subjected to discrimination under the

program solely because of his handicap, and 4) the relevant program or activity is receiving

federal financial assistance. *Maddox v. Univ. of Tennessee*, 62 F.3d 843, 846 (6th Cir. 1995);

*Doherty v. Southern College of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988), *cert. denied*, 493

U.S. 810; *Tanney v. Boles*, 400 F. Supp.2d 1027, 1047 (E.D. Mich. 2005).

Plaintiff has brought forth sufficient evidence, which, when viewed in the light most

favorable to the plaintiff, would establish that Rocky had an emotional and mental disability.

Defendants have not challenged the plaintiff's § 504 claim on the basis that Rocky was not

"otherwise qualified" to participate in the educational program at BCHS.  Further, the Board of

Education concedes it receives federal financial assistance for its programs.  Only the third

---

[8]This interpretation of the plaintiff's claim under § 504 is a generous one given the rather sparse
allegations in the Complaint under Count II which sets forth the § 504 claim.

element is left: whether Rocky was excluded from participation in, was denied the benefits of, or was subjected to discrimination under, the program solely because of his handicap.

While intent is not ordinarily included in the prima facie case for a claim of handicap discrimination brought under § 504, where a plaintiff seeks compensatory damages as opposed to purely equitable relief for a violation of § 504, the plaintiff must prove discriminatory intent on the part of the defendant. *Tanney v. Boles*, 400 F. Supp.2d at 1047 (citing *Powers v. MJB Acquisition Corp.,* 184, F.3d 1147, 1152-1153 (10th Cir. 1999)); *accord, Tuck v. HCA Health Servs. of Tenn.* Inc., 842 F. Supp. 988, 994-995 (M.D. Tenn. 1992), *aff'd* 7 F.3d 465 (6th Cir. 1993). Intentional discrimination need not be proved by direct evidence. Rather,

> [i]ntentional discrimination "can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Powers,* 184 F.3d at 1153. " 'Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood.' " *Kennington v. Carter,* 2004 WL 2137652, *7 (S.D.Ind.2004). Therefore, there are two standards for deliberate indifference: 1) notice that an accommodation is required, and 2) failure to act that is a result of conduct that is more than negligent and involves an element of deliberateness. *Id.*

*Tanney*, 400 F.Supp.2d at 1047 (footnote omitted); *accord Center v. City of West Carrollton*, 227 F. Supp.2d 863, 870-71 (S.D. Ohio 2002); *Davis v. Flexman*, 109 F. Supp.2d 776, 790-91 and n.14 (S.D. Ohio 1999); *Bartlett v. New York State Bd. of Educ. of Law Examiners*, 156 F.3d 321 (2d Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999); *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147 (10th Cir. 1999).

Plaintiff alleges that Rocky was discriminated against on the basis of his schizophrenia and depression and that this discrimination amounted to deliberate indifference. Plaintiff points to the deposition testimony of its expert, Linda Bluth, Ed. D., in support of plaintiff's contention

that the Board of Education's conduct toward Rocky constituted deliberate indifference. According to Dr. Bluth, there were sufficient indicia of problems during Rocky's tenure at the Bradley County schools to alert the Board of Education that intervention was necessary and the Board of Education's failure to take swifter and stronger measures constituted deliberate indifference. Dr. Bluth's opinion, however, as to a legal conclusion, is not dispositive. *See Gregory v. City of Louisville*, 444 F.3d 725, 745 n.9 (6th Cir. 2006) (plaintiff's expert may properly testify as to what a reasonable forensics examiner would do with hair examinations but could not offer expert opinion to address a legal conclusion "which is properly left to the courts to decide") *cert. denied*, 127 S.Ct. 962 (Jan. 8, 2007); *Woods v. Lecureux*, 110 F.3d 1215, 1219 (6th Cir. 1997) (district court in § 1983 action properly excluded testimony of expert witness to the effect that prison warden had been deliberately indifferent to murdered inmate's safety where such testimony was excluded on the ground that it improperly addressed a legal conclusion); *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (holding district court erred in admitting expert's testimony at trial that the police department's training of its officers constituted deliberate indifference because deliberate indifference is a legal term and it is the responsibility of the court, not testifying witnesses, to define legal terms), *cert. denied,* 513 U.S. 1111 (1995). Thus, while the Court can consider Dr. Bluth's opinion as to what the Board of Education should have done and when it should have done it, whether the Board of Education's actions or failure to act amounted to deliberate indifference is not a proper subject for Dr. Bluth's opinion testimony, and the Court shall not consider it.

Rocky was not diagnosed with schizophrenia until May 2004 at the end of Rocky's eighth grade school year. Considering the evidence in the light most favorable to the plaintiff, the Court

concludes no reasonable jury could find the defendants' conduct from May of 2004 to the time of Rocky's death rose to the level of deliberate indifference to Rocky's handicaps. While there were delays in evaluating Rocky, those were due primarily to the summer break; there was no outright refusal to evaluate and accommodate Rocky. Before school started, Ms. Bivens met with Rocky to show him around the school and to encourage him to see her if he had any problems. During the first week she personally assisted him in changing classes and his locker. Within the first month and a half BCHS employees had met twice with Rocky and Ms. Hill to discuss his needs and various possible accommodations. Ms. Bivens asked Ms. Hill about the "suicide" notes and was assured by Ms. Hill that Rocky was alright. Plaintiff asserts Rocky's teachers "forced" Rocky to reduce his medications to dangerous levels, but Ms. Hill's testimony indicates Mr. Clark told Ms. Hill to talk to Rocky's doctor about reducing his medication – she did so and it was the doctor who ultimately made the decision to reduce Rocky's medication. Teachers attempted to make accommodations for Rocky's sleepiness by allowing him to stand up and to drink caffeinated beverages in class.[9] Further, there was no evidence whatsoever to indicate that Rocky had ever had any difficulty on the bus or had posed a problem on the bus prior to the day of his death. Plaintiff has produced no admissible evidence that any person with authority including teachers or Ms. Bivens was aware Rocky was being harassed by other students. Statements in affidavits of students submitted by the plaintiff averring that Rocky had told Ms. Bivens about the harassment but she was unable to stop it constitute hearsay which is not

---

[9]While the plaintiff asserts that these accommodations did nothing more than make Rocky stand out more in the class room as being different, the undersigned observes that accommodations constitute, by their very nature, an adjustment to the usual method of doing something. If these were the incorrect accommodations, they were not instituted out of deliberate indifference to Rocky's needs.

considered in a motion for summary judgment. *See* Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on *personal knowledge* [and] shall set forth such facts *as would be admissible* in evidence...") (emphasis added).  Moreover, even if the Court were to consider those statements, they imply, at most, that Ms. Bivens did try to do something about it but was unsuccessful.  Such conduct does not amount to deliberate indifference.  As for Rocky's promotion to ninth grade, the evidence does not bear out that Rocky was promoted for non-academic reasons with any degree of deliberateness to ignore Rocky's mental and emotional needs.  He was promoted out of concern that an age difference between Rocky and his classmates would result in a worse situation than that created by moving him up. (Affidavit of Ritchie Stevenson, ¶7).   Rocky's treating psychologist, Dr. Milliron, "didn't necessarily think [promoting Rocky to ninth grade] was inappropriate," but he was concerned about Rocky's transition to the ninth grade. (Deposition of Trevor Milliron, Ph. D., 18-19).  Finally, the Court also finds it noteworthy that the plaintiff has pointed to no particular accommodation that was requested by Rocky, his guardian, or his doctors which was refused by BCHS.  Dr. Milliron stated in his deposition that there needed to be an informal, if not a formal, plan in place when Rocky started the ninth grade, but the specific elements of that plan have not been identified by the plaintiff, by Dr. Milliron, or by the plaintiff's expert, Dr. Bluth. While there was some delay in an evaluation, it did begin in increments as soon as school started at BCHS and, as discussed, some preliminary accommodations were made even before school started by Ms. Bivens and his teachers.  As for the disciplinary actions taken against Rocky for fighting, the evidence does not indicate that Ms. Hill or anyone else including Rocky's doctors ever asked for an accommodation. In fact, in his deposition, Dr. Milliron testified concerning the suspension that,

"I seem to recall that both Kathy and I thought that was an appropriate thing for Rocky." (Deposition of Trevor Milliron, Ph.D., 60-61). Nor has the plaintiff specified what she believes would have been appropriate discipline given Rocky's disabilities. Discerning deliberate indifference in the manner in which BCHS decided to discipline Rocky for fighting at school is a Herculean task absent some meaningful yardstick against which to measure the disciplinary action BCHS did take against Rocky. Further, as to the tragic incident on the bus, Ms. Hastings had no knowledge of Rocky's mental and emotional disabilities and therefore could not have based any decision to act or not act on the basis of Rocky's disabilities. Finally, no request for special transportation accommodation was ever made, and, more importantly, Rocky had ridden the bus throughout his school years without incident. Thus failure to provide special transportation accommodation does not rise to the level of deliberate indifference. In summation, when viewing the facts in the light most favorable to the plaintiff, no reasonable jury could conclude that the defendants' conduct towards Rocky amounted to deliberate indifference to his mental and emotional disabilities. Consequentially, defendants are entitled to summary judgment on the plaintiff's claims brought under § 504 of the Rehabilitation Act.

### C. Plaintiff's State Law Negligence Claims

All plaintiff's federal causes of action in this case shall be dismissed with prejudice. The only claims that remain are the plaintiff's state law claims of negligence against Ada Hastings, the Malones, the Board of Education and BCHS. Defendants urge the Court to decline to exercise supplemental jurisdiction over the plaintiff's state law causes of action and to dismiss them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

The district court may decline to exercise supplemental jurisdiction if the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1376(c)(3). The Court concludes that the state law claims involve issues which are particularly important to the Bradley County community and would be more appropriately addressed in that local venue. Accordingly, the Court will decline to exercise supplemental jurisdiction over the plaintiff's state law negligence claims and dismiss them without prejudice.

## V. Conclusion

For the reasons stated herein, the plaintiff's claims brought under 42 U.S.C. § 1983 and 20 U.S.C. § 794, § 504 of the Rehabilitation Act of 1973 shall be DISMISSED WITH PREJUDICE. The plaintiff's state law claims of negligence against Ada Hastings, the Malones, the Board of Education and BCHS shall be DISMISSED WITHOUT PREJUDICE. An appropriate order shall enter.

s/William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE